EXHIBIT B

1                IN THE UNITED STATES DISTRICT COURT

                  FOR THE WESTERN DISTRICT OF TEXAS

2                       SAN ANTONIO DIVISION

         ADAM TIJERINA,    )

3             Plaintiff,   )

         vs.               )CIVIL ACTION NO: 5:22-CV-00928-XR

4        NATIONAL DEBT      )

         RELIEF, LLC,      )

5             Defendant.   )

6

                         ------------------------

7                          ORAL DEPOSITION OF

                           ADAM TIJERINA

8                          February 15, 2023

                             Volume l

9                        ------------------------

10

11          ORAL DEPOSITION OF ADAM TIJERINA, Volume 1,

12      produced as a witness at the instance of the Defendant,

13      and duly sworn, was taken in the above-styled and

14      numbered cause on the DATE, from 11:07 a.m. to 6:04

15      p.m., before Dana Shapiro, CSR, in and for the State of

16      Illinois, reported by machine shorthand, at 100

17      Congress Avenue, Suite 1400, Austin, Texas 78701,

18      pursuant to the Federal Rules of Civil Procedure and

19      any provisions stated on the record or attached hereto.

20

21

22

23

24

25

                                                    Page 1

```
 1                    A P P E A R A N C E S
 2
 3        FOR THE PLAINTIFF:
 4        MS. LAURA EDMONDSON
          SANFORD LAW FIRM, PLLC
 5        KIRKPATRICK PLAZA
          10800 Financial Centre Pkway, Suite 510
 6        Little Rock, Arkansas 72211
          501-221-0088
 7        laura@sanfordlawfirm.com
 8        FOR THE DEFENDANT:
 9        LITTLER MENDELSON, P.C.
          MR. DAVID B. JORDAN
10        MS. KATIE BANKS (appeared via video teleconference)
          1301 McKinney Street, Suite 1900
11        Houston, Texas 77010
          713-951-9400
12        djordan@littler.com
          kbanks@littler.com
13             -and-
          MR. EDWARD GROH
14        NATIONAL DEBT RELIEF
          180 Maiden Lane, 30th Floor
15        New York, New York 10038
          609-558-7400
16        ed.groh@nationaldebtrelief.com
17        ALSO PRESENT:
          MS. ERICA VARGAS
18
19
20
21
22
23
24
25
```

Page  2

```
 1        BY MR. JORDAN:
 2            Q.    I'm going to hand you what's been marked as
 3        Exhibit 3.  That's your signature on that document?
 4            A.    Yes, it is my chicken scratch.
 5                              (WHEREUPON, a certain document was
 6                              marked Deposition Exhibit No. 4,
 7                              for identification, as of 2/15/23.)
 8        BY MR. JORDAN:
 9            Q.    Same here on Exhibit No. 4, that's your
10        signature?
11            A.    2006, Holy crap.
12            Q.    Mr. Tijerina, is that your signature on
13        Exhibit No. 4?
14            A.    Yes.
15                              (WHEREUPON, a certain document was
16                              marked Deposition Exhibit No. 5,
17                              for identification, as of 2/15/23.)
18        BY MR. JORDAN:
19            Q.    I'm going to hand you what I'm marking as
20        Exhibit No. 5.  I'd like you to look at this document.
21        And it's got two pages.  Let's start with you telling
22        me what the second page is.
23            A.    Give me a minute.  This looks like a
24        breakdown of hours on Upwork.
25            Q.    Okay.  These are hours that you would have
```

Page 139

1       manually added to Upwork for payment?

2            A.      Correct.

3            Q.      So if I'm right, this shows 168 hours,

4       correct?

5            A.      Correct.

6            Q.      So you would be paid 168 hours at whatever

7       hourly rate you were at at the time?

8            A.      Correct.

9            Q.      You will see here at the bottom of page 1

10      Elena Jablonski says, "23 hours for Monday sticks out."

11      Then lists out all of the hours goes from page 1 to 2.

12      Then Grant Eckert asks you, "Can you clarify the 23

13      hours?"

14                   Do you see that?

15           A.      Yes.

16           Q.      Then you say, "Hi, Grant.  12 hours for

17      ASW."

18                   What does that mean?

19           A.      That would have been my time at Affiliate

20      Summit West.  So we were at a conference there.

21           Q.      You were turning in hours for going to that

22      conference?

23           A.      Correct.

24           Q.      It says 11 hours for ASW trip expenses?

25           A.      Correct.

1     Q.      Team building, tips, et cetera, what is

2   that?

3     A.      Team building, tips, trip expenses.

4     Q.      I don't understand.  11 hours for -- I

5   don't understand that line.  That makes no sense to me.

6   Can you explain it.

7     A.      So depending on what my hourly rate was at

8   the time, divide the expenses by that to get the hours

9   calculation.

10    Q.      Why would you not just say, "Reimburse me a

11  thousand bucks"?

12    A.      That was not always presented as an option.

13    Q.      What do you mean?

14    A.      From HR.

15    Q.      I don't understand what you mean.

16    A.      I didn't know I could do that all of the

17  time with HR.

18    Q.      You didn't know you could do what?

19    A.      Get -- submit these team building expenses

20  for reimbursement.

21    Q.      So you would reflect them in terms of hours

22  on Upwork?

23    A.      So yes.

24    Q.      So a couple things I want to know.  So for

25  sure, right, this Monday, January 27 entry here of 23

Page 141

1    hours?

2         A.      Uh-huh.

3         Q.      That certainly reflects more than key

4    strokes, right?

5         A.      This was all manually entered.  I was not

6    at the computer.

7         Q.      Perfect.  That was 23 hours you typed in

8    regardless of what Upwork told you the timer on Upwork

9    would have said or not said?

10        A.      Because I was at -- physically at a

11   conference.

12        Q.      It also means that you actually didn't work

13   23 hours that day, but you were telling Grant and Elena

14   which you only worked 12 hours that day, correct?

15        A.      Yes.

16        Q.      Grant says, "Adam, don't you submit

17   expenses as an expense reimbursement?"

18        A.      Okay.

19        Q.      Do you recall what you said in response?

20        A.      It looks like I said, "Were you able to

21   clear the hours up?"  Okay.  Where is his response?

22        Q.      This is not your deposition, Mr. Tijerina.

23   You can do whatever you want.  It's not really funny.

24        A.      Okay.

25        Q.      We're trying to understand the allegations

                                        Page 142

```
 1        hours?
 2              A.      Because that's the first thing.
 3              Q.      Mr. Tijerina, let me finish my question.
 4                      Is it your testimony that if it's manually
 5        entered it's an expense reimbursement?
 6              A.      No.
 7              Q.      Okay.  Then the question as to whether they
 8        are manually entered or not has nothing to do with my
 9        question.  My question is, can you and I agree that the
10        hours listed on page 2 of Exhibit No. 5 do not
11        accurately reflect the hours you worked in that
12        particular period represented?
13              A.      For Monday, January 27, I did not work 23
14        hours.
15              Q.      What about Friday, January 24?
16              A.      That looks like a normal shift, yes, but I
17        can't say for certain without seeing the screen shots.
18              Q.      You don't know for sure?
19              A.      Correct.
20              Q.      What about January 30?
21              A.      Same answer.
22              Q.      Have no idea if that's work or there's
23        expenses baked into that?
24              A.      Well, they all look like 13 to 14 hours
25        which is a normal shift for me.  So those would likely
```

Page 146

1       hours.

2             Q.      Mr. Tijerina, you and I both agree whether

3       they're manually added or not has nothing to do, right,

4       with whether there is an expense reimbursement?   That

5       was what you testified to now twice, right?   Am I

6       right?

7             A.      I testified that 11 hours are for

8       reimbursement.

9             Q.      You don't know one way or the other from

10      looking at this report -- whether they are manual

11      entered or not?

12            A.      I'm unable.   Go ahead.

13            Q.      You would manually enter your actual work

14      hours too?

15            A.      It depends.   And that was approved per

16      Danny.   We had a conversation one time, "Hey, Danny,

17      I'm not always at the computer, but sometimes when I go

18      to the restroom or take a shower I get some thoughts

19      and ideas."   He's like, "Hey, me too.   Some of my best

20      ideas come from being in the bathroom."

21            Q.      You work in the shower?

22            A.      I get ideas in the shower, yes, because

23      that's --

24            Q.      While you were going to the bathroom?

25            A.      Or while I'm going to the bathroom, yes.

Veritext Legal Solutions
346-293-7000

```
 1        day?
 2             A.     I don't remember that day, but I had
 3        conversations with they wanted to iron out the details
 4        as far as handing over all of the logins I had to, and
 5        all the stuff I had access to.
 6             Q.     Who did you talk to about that?
 7             A.     I don't remember actually.
 8             Q.     Okay.  How soon -- how long after you had
 9        that conversation with Danny did you actually stop
10        doing work for National Debt Relief?
11             A.     I think it was a few weeks actually.
12             Q.     Did you apply for unemployment?
13             A.     I did not.
14             Q.     You were sent a severance agreement?
15             A.     Correct.
16             Q.     Who sent that severance agreement to you?
17             A.     It might have been Ed.
18             Q.     Did you read the agreement at the time?
19             A.     Probably.
20             Q.     Did you take it to a lawyer?
21             A.     I took it to two lawyers actually.
22             Q.     Okay.  And who are those two lawyers?
23             A.     I would have to look up their names.  One
24        was in New York, one was in Texas.
25             Q.     Who was the lawyer in Texas?
```

Page 176

```
1            A.      I would have to look it up the name.

2            Q.      How did you find the names?

3            A.      It might have been a Google search.

4            Q.      How did you go about -- you Google

5     searched.  How would you go about finding their names

6     now?

7            A.      Checking my email.

8            Q.      Did you engage the lawyer -- either one of

9     them?

10           A.      As far as?

11           Q.      Did you talk to them about your agreement?

12           A.      Yes.

13           Q.      I don't want to know the substance of what

14    you talked to them about.  Okay.  But do they have

15    correspondence back to you regarding your agreement?

16    Did you guys engage in written correspondence?

17           A.      I don't know.  I would have to check.

18           Q.      How many different calls or meetings did

19    you have with these lawyers?

20           A.      It should have been just one.

21           Q.      With each?

22           A.      Yes.

23           Q.      Did you pay for those lawyers?

24           A.      Yes.

25           Q.      How much did you pay?
```

Page 177

```
1              A.      I think one was 300, and one might have
2       been 500.
3              Q.      Why did you see two different lawyers?
4              A.      Because the company was based in New York,
5       and I was based in Texas.
6              Q.      And did you make -- did you send revisions
7       to that agreement back to Ed?
8              A.      We had a conversation.
9              Q.      When you are talking about Ed, who are you
10      talking about?
11             A.      Ed Groh.
12             Q.      Who is sitting here in the room with you
13      right now?
14             A.      Yes, I believe so.
15             Q.      You had conversations?
16             A.      We had one follow-up conversation on the
17      phone.  I don't think we did much through email other
18      than setting up the conversation.
19             Q.      Let me ask you.  Am I right that one of the
20      issues you raised was this idea that Upwork pays you
21      some money, a dollar per hour?
22             A.      To log my time.
23             Q.      They pay you?
24             A.      They logged the time.  It's coming from
25      NDR.
```

Page 178

```
 1          Exhibit No. 7.

 2                          (WHEREUPON, a certain document was

 3                          marked Deposition Exhibit No. 7,

 4                          for identification, as of 2/15/23.)

 5     BY MR. JORDAN:

 6          Q.      The -- do you recall in your agreement

 7     releasing claims?

 8          A.      Yes, there was a bunch of claims that I was

 9     releasing even though they shouldn't have been in there

10     in the first place.

11          Q.      Well, why would they not be in there in the

12     first place?

13          A.      That's what the two lawyers told me.  You

14     can't give up those rights.

15          Q.      I do not want you to tell me what those

16     lawyers told you.

17          A.      Okay.

18          Q.      Despite that you just did.

19                  Did you understand among other things you

20     released your rights under the Fair Labor Standards

21     Act?

22          A.      Which was one that I couldn't release.

23          Q.      But it's in the agreement?

24          A.      But you can't be released per the lawyer.

25          Q.      This is the lawyer in Texas?
```

Page 186

```
 1              A.      I don't know if it was the Texas or the New
 2       York one.
 3              Q.      Well, what else did the lawyer tell you
 4       about this agreement?
 5              A.      Thought I wasn't supposed to tell you what
 6       he told me about the agreement.
 7              Q.      I think you waived your privilege with
 8       regards to what that lawyer told you at this point
 9       because I warned you and then you said it again.  So
10       what else did the -- that lawyer, I won't talk about
11       Laura or her team.  What else did that lawyer in Texas
12       tell you about the agreement?
13              A.      I don't remember if it was the Texas or the
14       New York one.
15              Q.      But you nevertheless released those claims
16       anyway?
17              A.      I signed the agreement, correct.
18              Q.      Despite the advice that you got from that
19       counsel?
20              A.      Because he advised that we could pursue
21       those after even if we signed that.
22              Q.      So he said, "Why don't you sign the
23       agreement, get paid the consideration, and then pursue
24       the overtime afterwards"?
25              A.      He said, "You can't waive that right and we
```

Page 187

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION
        ADAM TIJERINA,     )
 3           Plaintiff,    )
        vs.                )CIVIL ACTION NO: 5:22-CV-00928-XR
 4      NATIONAL DEBT       )
        RELIEF, LLC,       )
 5           Defendant.    )
 6
 7
                       REPORTER'S CERTIFICATION
 8                     ORAL DEPOSITION OF
                          ADAM TIJERINA
 9                       February 15, 2023
10           I, Dana Shapiro, a Certified Shorthand Reporter,
11      hereby certify to the following:
12           That the witness, ADAM TIJERINA, was duly sworn
13      by the officer and that the transcript of the oral
14      deposition is a true record of the testimony given by
15      the witness;
16           I further certify that pursuant to FRCP Rule
17      30(e)(1) that the signature of the deponent: was
18      requested by the deponent or a party before the
19      completion of the deposition and that the signature is
20      to be before any notary public and returned within 30
21      days from date of receipt of the transcript.  If
22      returned, the attached Changes and Signature Pages
23      contain any changes and reasons therefore;
24           I further certify that I am neither counsel for,
25      related to, nor employed by any of the parties or
```

Page 227

1      attorneys in the action in which this proceeding was

2      taken, and further that I am not financially or

3      otherwise interested in the outcome of the action.

4           Certified to by me this March 2nd, 2023.

5

6

7

       Dana Shapiro, Illinois CSR 84-3597

8      Expiration Date:  5/31/2023

       Firm Registration No. 571

9      Veritext Legal Solutions

       300 Throckmorton Street, Suite 1600

10     Fort Worth, Texas 76102

       Phone.817-336-3042

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page  228

```
 1      COUNTY OF TRAVIS )

 2      STATE OF TEXAS   )

 3          I hereby certify that the witness was notified on

 4      _____, that the witness has 30 days

 5      after being notified by the officer that the transcript

 6      is available for review by the witness and if there are

 7      changes in the form or substance to be made, then the

 8      witness shall sign a statement reciting such changes

 9      and the reasons given by the witness for making them;

10          That the witness' signature was/was not returned

11      as of _____.

12          Subscribed and sworn to on this _____ day of

13      _____, 20_  .

14

15                     Dana Shapiro

                       Dana Shapiro, Illinois CSR 84-3597

16                     Expiration Date:  5/31/2023

                       Firm Registration No. 571

17                     Veritext Legal Solutions

                       300 Throckmorton Street, Suite 1600

18                     Fort Worth, Texas 76102

                       Phone.817-336-3042

19

20

21

22

23

24

25

                                             Page  229
```