

**FILED**

APR 1 4 2023

CLERK. U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ADAM TIJERINA,                          §
                                        §
            Plaintiff,                   §
                                        §
vs.                                     §      CIVIL ACTION NO: 5:22-cv-00928-XR
                                        §
NATIONAL DEBT RELIEF, LLC,              §
                                        §
            Defendant.                   §

## DEFENDANT'S ORIGINAL COUNTERCLAIM
## AGAINST PLAINTIFF ADAM TIJERINA

National Debt Relief, LLC, ("NDR") Defendant in the above-captioned cause, files this

Counterclaim against Adam Tijerina, Plaintiff in the above-captioned cause, and in support show

as follows:

### I.
### NATURE OF THE ACTION

1.      NDR brings this Counterclaim based on Tijerina's recently discovered fraudulent

actions and breach of the Severance Agreement entered into between the parties on June 18,

2021 (the "Severance Agreement").  NDR recently learned that Tijerina fraudulently induced

NDR to enter into the Severance Agreement with Tijerina which Tijerina subsequently breached

by bringing suit against Defendant. As a result, NDR has incurred the expense of paying Tijerina

under the Severance Agreement and the expense of defending this wholly frivolous lawsuit.

### II.
### PARTIES

2.      NDR is a foreign limited liability company incorporated under the laws of New

York.

3.      In his Original Complaint, Tijerina states he is a resident of Bexar County, Texas. ECF No. 1 ¶ 8.

## III.
## JURISDICTION & VENUE

4.      This Court has original subject-matter jurisdiction over Tijerina's FLSA claims against NDR as set forth in his Original Complaint because they arise under federal law. 28 U.S.C. § 1331. This Court has supplemental subject-matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a) because this Counterclaim is so related to Tijerina's FLSA claims that together they form part of the same case or controversy for purposes of Article III of the United States Constitution.  The Court has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.  Specifically, Tijerina is a citizen of Texas and NDR is a citizen of New York and Florida because its members are citizens of New York and Florida.

5.      This Court has personal jurisdiction over Tijerina, who admits he is a resident of this district and division and has previously appeared before this Court as Plaintiff in the above-captioned cause.

6.      The Court has personal jurisdiction over the NDR with respect to this Counterclaim because the Counterclaim arises out of NDR's contacts with the forum state and therefore the Court may exercise specific jurisdiction over NDR with respect to this Counterclaim.

7.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to this Counterclaim occurred in this district and in this division. 28 U.S.C. § 1391(b)(2).

## IV.
## FACTS

8.     Plaintiff Adam Tijerina provided marketing services from time to time to NDR from June 2014 until June 2021, at which time his relationship with NDR was severed. As part of the service he provided to NDR, for which he billed NDR at an hourly rate, Tijerina purchased and set up multiple domain names and acquired other intellectual property on NDR's behalf (hereinafter the "IP Assets").

9.     The IP Assets were intended for NDR's sole, beneficial, and commercial use, and were material to its business.

10.     In or about June 2021, at or near the end of its relationship with him, NDR discovered that Tijerina had acquired the IP Assets in his personal name, rather than in NDR's name, and that Tijerina, therefore, personally owned those assets.  In addition to having personal ownership of the IP Assets, Tijerina had not provided NDR any passwords or other information necessary to operate or access the property without his assistance or involvement.

11.     To obtain ownership and control over the IP Assets, NDR entered into a written agreement with Tijerina (hereinafter the "Severance Agreement") whereby, *inter alia*, Tijerina transferred all ownership, right, and title to the IP Assets to NDR.

12.     NDR and Tijerina negotiated the terms of the Severance Agreement.  As part of the negotiation, Tijerina requested that NDR increase the consideration it was to pay him under the Severance Agreement to compensate him for allegedly unpaid overtime work.

13.     Although NDR disagreed that Tijerina was entitled to overtime compensation, it agreed, at Tijerina's request, to increase the amount it paid him under the Severance Agreement by more than $29,000 (hereinafter the "Additional Consideration").  The parties executed the Severance Agreement on June 18, 2021, and NDR thereafter paid to Tijerina the $145,600 in

total consideration (hereinafter the "Total Consideration"), which included the Additional Consideration that the parties negotiated to fully compensate Tijerina for his overtime claim.

14.     In exchange for the amounts NDR agreed to pay Tijerina under the Severance Agreement, Tijerina agreed, *inter alia*, to release certain causes of action and claims against NDR. He also represented in the Severance Agreement that he had been paid or had received all compensation and benefits due to him by virtue of his working relationship and the cessation of his working relationship with NDR, including, without limitation, all compensation for hours worked and services provided:

> Receipt of All Remuneration. As of this Separation Date, Tijerina has been paid or has received all compensation and benefits due to him by virtue of his working relationship and the cessation of his working relationship with NDR, including without limitation all compensation for hours worked and service provided.

Severance Agreement, ¶ 11.

15.     Tijerina also agreed, in the Severance Agreement, to release any FLSA claims that he might have against NDR. He further agreed that it would be a default under the Severance Agreement to commence a case, proceeding, or other action against NDR arising out of or relating to Tijerina's working relationship with NDR or any of the released claims.

> Default. The occurrence of one or more of the following shall constitute a Default under this Agreement:
>
> Tijerina commences a case, proceeding or other action against any of the NDR Entities arising out of or relating to his working relationship with NDR, asserting any Released Claims.

Severance Agreement, ¶¶ 7 and 12.

16.     Tijerina's representations, promises, and releases, as contained in the Severance Agreement, materially induced NDR to agree to and execute the Severance Agreement and to pay Tijerina the Total Consideration, including the Additional Consideration.

17.    NDR would not have executed the Severance Agreement or agreed to pay the Total Consideration or the Additional Consideration in the absence of Tijerina's representations, promises, and releases as contained in the Severance Agreement.

18.    NDR made all payments due under the Severance Agreement and fully performed all of its obligations under same.

19.    Despite the plain language of the Severance Agreement, including the representations, release and conditions of default found therein, Tijerina filed this suit alleging violation of the Fair Labor Standards Act on August 26, 2022, just two months after he received his final payment under the Severance Agreement.

20.    Tijerina gave his deposition in the above captioned lawsuit on February 15, 2023. In his deposition, when questioned about his release of his claims for overtime under the Fair Labor Standards Act, Tijerina unequivocally testified (with his counsel present and without objection) that he had two different attorneys review the terms of the Severance Agreement and advise him, prior to him signing, that his release of his FLSA claim was supposedly ineffective.[1] Tijerina further testified his attorney told him "[w]hy don't you sign the agreement, get paid the consideration, and then pursue the overtime afterwards?" The attorney further told Tijerina, "[i]f we want to, we can pursue that because you can't waive that right." Believing that the release was ineffective, Tijerina never informed NDR prior to execution of the Agreement that despite negotiating and receiving a payment for overtime, he intended to pursue a subsequent lawsuit against the Company, and otherwise made the representations set out in Paragraph 10 above. Instead, Tijerina testified that after receiving this advice, he signed the Severance Agreement,

---

[1] Tijerina additionally testified at his deposition that he charged expenses he incurred and other non-work activities to NDR as hours worked. Thus, the hours Tijerina charged to NDR necessarily do not represent the actual number of hours that Tijerina worked. Tijerina repeatedly testified that he could not recall when he did this and for how many hours, making it impossible to calculate how many hours Tijerina allegedly worked per week.

believing it to be ineffective as to his claims for overtime, and subsequently bought suit alleging he was due overtime under the FLSA.

21.     Through his fraudulent representation that he would not bring a case against NDR arising out of or relating to his working relationship with NDR or any of the released claims and his failure to disclose that he did not believe the Severance Agreement was effective as to his claims under the FLSA, Tijerina fraudulently induced NDR to enter into the Severance Agreement and fully pay him pursuant to the terms of the Severance Agreement.

22.     Because of Tijerina's fraudulent inducement, failure to disclosure and breach of the Severance Agreement, NDR was harmed— NDR paid Tijerina a sum that he was not entitled to, and is now being forced to spend time and money (including attorneys' fees) defending against this frivolous lawsuit Tijerina brought for a claim he negotiated an additional payment for and in turn released.

**V.**
**CAUSES OF ACTION**

**COUNT ONE: COMMON LAW FRAUD, FRAUD IN THE INDUCEMENT AND FRAUD BY NONDISCLOSURE UNDER TEXAS LAW**

23.     NDR incorporates the foregoing paragraphs herein by reference.

24.     Tijerina represented that he was releasing his claims under the FLSA and would not file suit against NDR for any claim arising out of or relating to his working relationship with NDR or any of the released claims when he agreed to and executed the Severance Agreement. Tijerina made this false representation knowingly, with the intent to defraud NDR. Specifically, Tijerina consulted an attorney and was advised that he was not effectively releasing his FLSA overtime claim even if he executed the agreement, and that he should execute the agreement with the intent not to comply with its terms, and only after accepting the consideration, bring an additional lawsuit later.  Tijerina thereafter knowingly negotiated an extra payment due to the

hours he worked that exceeded 40 hours a week, accepted the full amount of consideration from NDR while planning to sue NDR in breach of the express terms of the Severance Agreement once Tijerina received the final payment. Tijerina did not disclosure this information to NDR at anytime prior to or at the execution of the Severance Agreement.

25.     The false representation was material. NDR would not have entered into the Severance Agreement but for Tijerina's false representation and failure to disclose. The release of all claims and agreement not to sue for any claim arising out of or relating to Tijerina's working relationship with NDR was a key, material term in NDR agreeing to execute the Severance Agreement.

26.     When Tijerina executed the Severance Agreement and represented to NDR he was releasing his claims and would not bring suit against NDR for any released claim arising out of or relating to his working relationship with NDR, he did so knowing that such representation was false as evidenced by his testimony in this suit and the advice he testified that he received from counsel.

27.     Tijerina made this false representation to NDR with the intent that it act on it and execute the Severance Agreement and pay him pursuant to same.

28.     NDR in fact did execute the Severance Agreement and fully perform pursuant to its terms.

29.     Tijerina then filed the instant lawsuit for violations of the FLSA, both a released claim and one arising out of or relating to his working relationship with NDR, despite executing the Severance Agreement that he fraudulently induced NDR to pay him under.

30.     Tijerina's fraud thus has harmed NDR because it paid Tijerina under the terms of the Severance Agreement and because NDR has been injured in that it must now defend against

a lawsuit based on claims that are part of the release therein and that Tijerina had no intention of ever releasing.

## COUNT TWO: BREACH OF CONTRACT UNDER TEXAS LAW

31.     NDR incorporates the foregoing paragraphs herein by reference.

32.     The parties entered into a valid binding contract, the Severance Agreement, on June 18, 2021.

33.     NDR fully performed all of its obligations under the Severance Agreement and paid Tijerina in full the $145,600 due Tijerina under the Severance Agreement.

34.     Tijerina breached paragraphs 7, 11 and 12 of the Severance Agreement when he filed the present lawsuit.  Tijerina has sustained actual damages, including the severance amount paid to Tijerina and NDR's costs of defense against Tijerina's frivolous lawsuit.

## COUNT THREE: BREACH OF THE DUTY OF LOYALTY UNER TEXAS LAW

35.     NDR incorporates the foregoing paragraphs herein by reference.

36.     Pleading in the alternative, a fiduciary relationship existed between Tijerina and NDR.   Specifically, Texas recognizes that the agent principal relationship gives rise to a fiduciary duty.  An agent has a duty to deal openly with the employer, to fully disclose to the employer information about matters affecting the company's business and a duty to deal fairly with the principal in all transactions between them.

37.     Tijerina breached that duty when he purchased and operated multiple domain names and had acquired other intellectual property for NDR under his own name and ownership and not NDR's ownership and failed to provide NDR any passwords or other necessary information to operate or access the property.  The breach resulted in injury to NDR and a benefit to Tijerina in the amount of the severance agreement payment.

### COUNT FOUR: UNJUST ENRICHMENT UNDER TEXAS LAW

38.    NDR incorporates the foregoing paragraphs herein by reference.

39.    Tijerina procured the payment of $145,600 from NDR through fraud. Tijerina thereby obtained a benefit to which he was not entitled and was unjustly enriched at NDR's expense.

40.    NDR is entitled to restitution of the fraudulently received payment made to Tijerina in an amount to be determined at trial.

### VI.
### JURY DEMAND

NDR hereby demands trial by jury on the claims presented in this Counterclaim.

### VII.
### PRAYER

WHEREFORE, PREMISES CONSIDERED, NDR prays this Court award it the following:

a)  actual damages, including the severance amount paid to Tijerina and NDR's costs of defense against Tijerina's frivolous lawsuit;

b)  exemplary damages based on clear and convincing evidence showing that Tijerina committed fraud;

c)  restitution damages under NDR's equitable causes of action;

d)  attorneys' fees;

e)  pre- and post-judgment interest;

f)  court costs; and

g)  all other relief, in law or at equity, to which NDR may show itself justly entitled.

Date filed:  April 4, 2023

Respectfully submitted,

*Of Counsel*:

Katie Banks
State Bar No. 24092114
Fed. ID No. 2516169
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
1301 McKinney Street
Suite 1900
Houston, TX 77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
kbanks@littler.com

/s/ *David B. Jordan*
David B. Jordan (Attorney-in-Charge)
State Bar No. 24032603
Fed. ID No. 40416
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
1301 McKinney Street
Suite 1900
Houston, TX 77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
djordan@littler.com

**ATTORNEY FOR DEFENDANT
NATIONAL DEBT RELIEF, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April 2023, a true and correct copy of the foregoing Defendant's Original Answer and Affirmative and Other Defenses to Plaintiff's Complaint was filed via CM/ECF, and served via the Court's e-filing system, email, and/or United States mail to the individuals listed below:

Colby Qualls
Josh Sanford
SANFORD LAW FIRM, PLLC
Kirkpatrick Plaza
10800 Financial Centre Pkwy, Suite 510
Little Rock, Arkansas 72211

**ATTORNEYS FOR PLAINTIFF**

/s/ *David B. Jordan*
David B. Jordan

# EXHIBIT B

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION
     ADAM TIJERINA,     )
3           Plaintiff,  )
     vs.                )CIVIL ACTION NO: 5:22-CV-00928-XR
4    NATIONAL DEBT      )
     RELIEF, LLC,       )
5           Defendant.  )
6

                         ------------------------
7                         ORAL DEPOSITION OF
                          ADAM TIJERINA
8                         February 15, 2023
                          Volume 1
9                         ------------------------
10
11         ORAL DEPOSITION OF ADAM TIJERINA, Volume 1,
12    produced as a witness at the instance of the Defendant,
13    and duly sworn, was taken in the above-styled and
14    numbered cause on the DATE, from 11:07 a.m. to 6:04
15    p.m., before Dana Shapiro, CSR, in and for the State of
16    Illinois, reported by machine shorthand, at 100
17    Congress Avenue, Suite 1400, Austin, Texas 78701,
18    pursuant to the Federal Rules of Civil Procedure and
19    any provisions stated on the record or attached hereto.
20
21
22
23
24
25

                                              Page 1

```
 1                    A P P E A R A N C E S
 2
 3        FOR THE PLAINTIFF:
 4        MS. LAURA EDMONDSON
          SANFORD LAW FIRM, PLLC
 5        KIRKPATRICK PLAZA
          10800 Financial Centre Pkway, Suite 510
 6        Little Rock, Arkansas 72211
          501-221-0088
 7        laura@sanfordlawfirm.com
 8        FOR THE DEFENDANT:
 9        LITTLER MENDELSON, P.C.
          MR. DAVID B. JORDAN
10        MS. KATIE BANKS (appeared via video teleconference)
          1301 McKinney Street, Suite 1900
11        Houston, Texas 77010
          713-951-9400
12        djordan@littler.com
          kbanks@littler.com
13              -and-
          MR. EDWARD GROH
14        NATIONAL DEBT RELIEF
          180 Maiden Lane, 30th Floor
15        New York, New York 10038
          609-558-7400
16        ed.groh@nationaldebtrelief.com
17        ALSO PRESENT:
          MS. ERICA VARGAS
18
19
20
21
22
23
24
25
```

Page 2

1      BY MR. JORDAN:

2           Q.    I'm going to hand you what's been marked as

3      Exhibit 3.  That's your signature on that document?

4           A.    Yes, it is my chicken scratch.

5                            (WHEREUPON, a certain document was

6                            marked Deposition Exhibit No. 4,

7                            for identification, as of 2/15/23.)

8      BY MR. JORDAN:

9           Q.    Same here on Exhibit No. 4, that's your

10     signature?

11          A.    2006, Holy crap.

12          Q.    Mr. Tijerina, is that your signature on

13     Exhibit No. 4?

14          A.    Yes.

15                           (WHEREUPON, a certain document was

16                           marked Deposition Exhibit No. 5,

17                           for identification, as of 2/15/23.)

18     BY MR. JORDAN:

19          Q.    I'm going to hand you what I'm marking as

20     Exhibit No. 5.  I'd like you to look at this document.

21     And it's got two pages.  Let's start with you telling

22     me what the second page is.

23          A.    Give me a minute.  This looks like a

24     breakdown of hours on Upwork.

25          Q.    Okay.  These are hours that you would have

Page 139

1    manually added to Upwork for payment?

2         A.    Correct.

3         Q.    So if I'm right, this shows 168 hours,

4    correct?

5         A.    Correct.

6         Q.    So you would be paid 168 hours at whatever

7    hourly rate you were at at the time?

8         A.    Correct.

9         Q.    You will see here at the bottom of page 1

10   Elena Jablonski says, "23 hours for Monday sticks out."

11   Then lists out all of the hours goes from page 1 to 2.

12   Then Grant Eckert asks you, "Can you clarify the 23

13   hours?"

14              Do you see that?

15        A.    Yes.

16        Q.    Then you say, "Hi, Grant.  12 hours for

17   ASW."

18              What does that mean?

19        A.    That would have been my time at Affiliate

20   Summit West.  So we were at a conference there.

21        Q.    You were turning in hours for going to that

22   conference?

23        A.    Correct.

24        Q.    It says 11 hours for ASW trip expenses?

25        A.    Correct.

Veritext Legal Solutions
346-293-7000

1        Q.      Team building, tips, et cetera, what is

2    that?

3        A.      Team building, tips, trip expenses.

4        Q.      I don't understand.  11 hours for -- I

5    don't understand that line.  That makes no sense to me.

6    Can you explain it.

7        A.      So depending on what my hourly rate was at

8    the time, divide the expenses by that to get the hours

9    calculation.

10       Q.      Why would you not just say, "Reimburse me a

11   thousand bucks"?

12       A.      That was not always presented as an option.

13       Q.      What do you mean?

14       A.      From HR.

15       Q.      I don't understand what you mean.

16       A.      I didn't know I could do that all of the

17   time with HR.

18       Q.      You didn't know you could do what?

19       A.      Get -- submit these team building expenses

20   for reimbursement.

21       Q.      So you would reflect them in terms of hours

22   on Upwork?

23       A.      So yes.

24       Q.      So a couple things I want to know.  So for

25   sure, right, this Monday, January 27 entry here of 23

Page 141

1    hours?

2          A.     Uh-huh.

3          Q.     That certainly reflects more than key

4    strokes, right?

5          A.     This was all manually entered.  I was not

6    at the computer.

7          Q.     Perfect.  That was 23 hours you typed in

8    regardless of what Upwork told you the timer on Upwork

9    would have said or not said?

10         A.     Because I was at -- physically at a

11   conference.

12         Q.     It also means that you actually didn't work

13   23 hours that day, but you were telling Grant and Elena

14   which you only worked 12 hours that day, correct?

15         A.     Yes.

16         Q.     Grant says, "Adam, don't you submit

17   expenses as an expense reimbursement?"

18         A.     Okay.

19         Q.     Do you recall what you said in response?

20         A.     It looks like I said, "Were you able to

21   clear the hours up?"  Okay.  Where is his response?

22         Q.     This is not your deposition, Mr. Tijerina.

23   You can do whatever you want.  It's not really funny.

24         A.     Okay.

25         Q.     We're trying to understand the allegations

Page 142

1      hours?

2              A.      Because that's the first thing.

3              Q.      Mr. Tijerina, let me finish my question.

4                      Is it your testimony that if it's manually

5      entered it's an expense reimbursement?

6              A.      No.

7              Q.      Okay.  Then the question as to whether they

8      are manually entered or not has nothing to do with my

9      question.  My question is, can you and I agree that the

10     hours listed on page 2 of Exhibit No. 5 do not

11     accurately reflect the hours you worked in that

12     particular period represented?

13             A.      For Monday, January 27, I did not work 23

14     hours.

15             Q.      What about Friday, January 24?

16             A.      That looks like a normal shift, yes, but I

17     can't say for certain without seeing the screen shots.

18             Q.      You don't know for sure?

19             A.      Correct.

20             Q.      What about January 30?

21             A.      Same answer.

22             Q.      Have no idea if that's work or there's

23     expenses baked into that?

24             A.      Well, they all look like 13 to 14 hours

25     which is a normal shift for me.  So those would likely

Page 146

1    hours.

2         Q.    Mr. Tijerina, you and I both agree whether

3    they're manually added or not has nothing to do, right,

4    with whether there is an expense reimbursement?  That

5    was what you testified to now twice, right?  Am I

6    right?

7         A.    I testified that 11 hours are for

8    reimbursement.

9         Q.    You don't know one way or the other from

10   looking at this report -- whether they are manual

11   entered or not?

12        A.    I'm unable.  Go ahead.

13        Q.    You would manually enter your actual work

14   hours too?

15        A.    It depends.  And that was approved per

16   Danny.  We had a conversation one time, "Hey, Danny,

17   I'm not always at the computer, but sometimes when I go

18   to the restroom or take a shower I get some thoughts

19   and ideas."  He's like, "Hey, me too.  Some of my best

20   ideas come from being in the bathroom."

21        Q.    You work in the shower?

22        A.    I get ideas in the shower, yes, because

23   that's --

24        Q.    While you were going to the bathroom?

25        A.    Or while I'm going to the bathroom, yes.

Page 148

1    day?

2          A.    I don't remember that day, but I had

3    conversations with they wanted to iron out the details

4    as far as handing over all of the logins I had to, and

5    all the stuff I had access to.

6          Q.    Who did you talk to about that?

7          A.    I don't remember actually.

8          Q.    Okay.  How soon -- how long after you had

9    that conversation with Danny did you actually stop

10   doing work for National Debt Relief?

11         A.    I think it was a few weeks actually.

12         Q.    Did you apply for unemployment?

13         A.    I did not.

14         Q.    You were sent a severance agreement?

15         A.    Correct.

16         Q.    Who sent that severance agreement to you?

17         A.    It might have been Ed.

18         Q.    Did you read the agreement at the time?

19         A.    Probably.

20         Q.    Did you take it to a lawyer?

21         A.    I took it to two lawyers actually.

22         Q.    Okay.  And who are those two lawyers?

23         A.    I would have to look up their names.  One

24   was in New York, one was in Texas.

25         Q.    Who was the lawyer in Texas?

Page 176

1          A.      I would have to look it up the name.

2          Q.      How did you find the names?

3          A.      It might have been a Google search.

4          Q.      How did you go about -- you Google

5     searched.  How would you go about finding their names

6     now?

7          A.      Checking my email.

8          Q.      Did you engage the lawyer -- either one of

9     them?

10         A.      As far as?

11         Q.      Did you talk to them about your agreement?

12         A.      Yes.

13         Q.      I don't want to know the substance of what

14    you talked to them about.  Okay.  But do they have

15    correspondence back to you regarding your agreement?

16    Did you guys engage in written correspondence?

17         A.      I don't know.  I would have to check.

18         Q.      How many different calls or meetings did

19    you have with these lawyers?

20         A.      It should have been just one.

21         Q.      With each?

22         A.      Yes.

23         Q.      Did you pay for those lawyers?

24         A.      Yes.

25         Q.      How much did you pay?

1           A.      I think one was 300, and one might have
2    been 500.
3           Q.      Why did you see two different lawyers?
4           A.      Because the company was based in New York,
5    and I was based in Texas.
6           Q.      And did you make -- did you send revisions
7    to that agreement back to Ed?
8           A.      We had a conversation.
9           Q.      When you are talking about Ed, who are you
10   talking about?
11          A.      Ed Groh.
12          Q.      Who is sitting here in the room with you
13   right now?
14          A.      Yes, I believe so.
15          Q.      You had conversations?
16          A.      We had one follow-up conversation on the
17   phone.  I don't think we did much through email other
18   than setting up the conversation.
19          Q.      Let me ask you.  Am I right that one of the
20   issues you raised was this idea that Upwork pays you
21   some money, a dollar per hour?
22          A.      To log my time.
23          Q.      They pay you?
24          A.      They logged the time.  It's coming from
25   NDR.

                                                Page 178

1       Exhibit No. 7.

2                                   (WHEREUPON, a certain document was

3                                   marked Deposition Exhibit No. 7,

4                                   for identification, as of 2/15/23.)

5       BY MR. JORDAN:

6              Q.     The -- do you recall in your agreement

7       releasing claims?

8              A.     Yes, there was a bunch of claims that I was

9       releasing even though they shouldn't have been in there

10      in the first place.

11             Q.     Well, why would they not be in there in the

12      first place?

13             A.     That's what the two lawyers told me.  You

14      can't give up those rights.

15             Q.     I do not want you to tell me what those

16      lawyers told you.

17             A.     Okay.

18             Q.     Despite that you just did.

19                    Did you understand among other things you

20      released your rights under the Fair Labor Standards

21      Act?

22             A.     Which was one that I couldn't release.

23             Q.     But it's in the agreement?

24             A.     But you can't be released per the lawyer.

25             Q.     This is the lawyer in Texas?

Page 186

1        A.      I don't know if it was the Texas or the New

2    York one.

3        Q.      Well, what else did the lawyer tell you

4    about this agreement?

5        A.      Thought I wasn't supposed to tell you what

6    he told me about the agreement.

7        Q.      I think you waived your privilege with

8    regards to what that lawyer told you at this point

9    because I warned you and then you said it again.  So

10   what else did the -- that lawyer, I won't talk about

11   Laura or her team.  What else did that lawyer in Texas

12   tell you about the agreement?

13       A.      I don't remember if it was the Texas or the

14   New York one.

15       Q.      But you nevertheless released those claims

16   anyway?

17       A.      I signed the agreement, correct.

18       Q.      Despite the advice that you got from that

19   counsel?

20       A.      Because he advised that we could pursue

21   those after even if we signed that.

22       Q.      So he said, "Why don't you sign the

23   agreement, get paid the consideration, and then pursue

24   the overtime afterwards"?

25       A.      He said, "You can't waive that right and we

Page 187

```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
     ADAM TIJERINA,     )
3          Plaintiff,   )
     vs.                )CIVIL ACTION NO: 5:22-CV-00928-XR
4    NATIONAL DEBT       )
     RELIEF, LLC,       )
5          Defendant.   )
6
7

                    REPORTER'S CERTIFICATION
8                     ORAL DEPOSITION OF
                        ADAM TIJERINA
9                     February 15, 2023
10        I, Dana Shapiro, a Certified Shorthand Reporter,
11   hereby certify to the following:
12        That the witness, ADAM TIJERINA, was duly sworn
13   by the officer and that the transcript of the oral
14   deposition is a true record of the testimony given by
15   the witness;
16        I further certify that pursuant to FRCP Rule
17   30(e)(1) that the signature of the deponent: was
18   requested by the deponent or a party before the
19   completion of the deposition and that the signature is
20   to be before any notary public and returned within 30
21   days from date of receipt of the transcript.  If
22   returned, the attached Changes and Signature Pages
23   contain any changes and reasons therefore;
24        I further certify that I am neither counsel for,
25   related to, nor employed by any of the parties or
```

Page 227

1    attorneys in the action in which this proceeding was

2    taken, and further that I am not financially or

3    otherwise interested in the outcome of the action.

4           Certified to by me this March 2nd, 2023.

5

6

7
                    Dana Shapiro, Illinois CSR 84-3597

8                   Expiration Date:  5/31/2023

                    Firm Registration No. 571

9                   Veritext Legal Solutions

                    300 Throckmorton Street, Suite 1600

10                  Fort Worth, Texas 76102

                    Phone.817-336-3042

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 228

```
 1       COUNTY OF TRAVIS )

 2       STATE OF TEXAS    )

 3            I hereby certify that the witness was notified on

 4       _____, that the witness has 30 days

 5       after being notified by the officer that the transcript

 6       is available for review by the witness and if there are

 7       changes in the form or substance to be made, then the

 8       witness shall sign a statement reciting such changes

 9       and the reasons given by the witness for making them;

10            That the witness' signature was/was not returned

11       as of _____.

12            Subscribed and sworn to on this _____ day of

13       _____, 20__ .

14

15

         Dana Shapiro, Illinois CSR 84-3597

16       Expiration Date:  5/31/2023

         Firm Registration No. 571

17       Veritext Legal Solutions

         300 Throckmorton Street, Suite 1600

18       Fort Worth, Texas 76102

         Phone.817-336-3042

19

20

21

22

23

24

25
```

                                                    Page 229